## Hurd v. Commonwealth.

April 30, 1948.

Bertram & Bertram for appellant.

A. E. Funk, Attorney General, and Armand Angelucci, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Oris Hurd has been convicted of the crime of wilful murder and his punishment fixed at life imprisonment. The principal ground relied upon for reversal of the judgment is alleged error of the court in overruling appellant's motion for a directed verdict of acquittal.

Appellant and Roy Bridgeman were indicted jointly for the murder of Eugene Bowlin and were tried together. Bridgeman was acquitted. Bowlin's death occurred on March 30, 1947. Bowlin and his wife had just moved into a house located in Russell County on the north bank of the Cumberland River near the mouth of

Thomas' Branch. Hurd and Bridgeman lived in Monticello, in Wayne County, 12 miles south of the river. On Sunday morning, March 30, 1947, Hurd and Bridgeman started in a truck to the Cumberland River to fish. Hurd took with him his shotgun, which he testified he intended to trade to Tom Arthur, who lived on the road to the river. Near the river the truck in which they were riding ran into a ditch and they walked to the south bank of the river. They saw several men fishing on the north bank near the mouth of Thomas' Branch and Hurd called and asked them to bring a boat and take him and Bridgeman across the river. One of the men called back and told them there was a boat below them in the bushes. Hurd and Bridgeman got in the boat and crossed the river. Hurd secured from a hiding place on the bank of the river a one-half gallon fruit jar containing about a quart of whiskey which he had concealed a few days previously. The men fishing on the north bank of the river were Otha Lee Burton, Walter Denney, Curtis Littrell and the deceased, Gene Bowlin. Appellant asked them to cross the river and assist him in pushing the truck out of the ditch. They agreed, but the parties present first drank some whiskey. They then went to the home of Gene Bowlin which was near by and took the whiskey and shotgun with them. The only person at the Bowlin home when they arrived was Bowlin's wife, Della Bowlin, who was the divorced wife of appellant. Soon thereafter Joe McClellan, owner of the land on which the Bowlin home was located, and his grandson, Billy McClellan, appeared. The men present drank the remainder of the whiskey and went back to the river, leaving the shotgun and the empty fruit jar at the Bowlin home. Burton, Denney and Littrell got in a boat and started across the river. The boat in which appellant and Bridgeman had crossed was about 50 yards down the river and they and the deceased got in this boat, appellant in one end, Bridgeman in the other and the deceased in the center. Appellant and Bridgeman each had an oar. As the boat approached the middle of the river where the current was swift the deceased began undressing. He removed all of his clothing except his undershirt and either jumped or fell out of the boat. He began swimming downstream, and, according to the evidence for the Commonwealth, the boat

remained near him. It is the theory of the Commonwealth that the deceased jumped into the river because of threats made by appellant, or was thrown into the river when appellant rocked the boat and that appellant followed him in the boat and struck him with the oar or paddle. Bowlin disappeared and appellant and Bridgeman continued to the south shore of the river without making any effort to rescue him. The deceased's body was recovered two weeks later five or six miles downstream from the point where he disappeared. Three witnesses, who were present when the body was removed from the river, testified that there was a bruise about two and one-half inches long on the deceased's right shoulder. Della Bowlin, wife of the deceased and divorced wife of the appellant, testified in part as follows:

"Q. Tell the jury exactly what the defendants did and what they said when they came to your house on this day. A. Just come in. Oris ·brought the whisky in, had it in his shirt and set it on the table and all the rest went in the other room except him. He wouldn't go. I was in the kitchen and he stayed in there. I asked him to go, but he said he wasn't going, and I quit cooking and went in there myself.

"Q. Did Oris Hurd then come in the other room where you were? A. He come in there when they first come up.

"Q. After you left the kitchen and went in the other room, did Oris Hurd follow you in there? A. No.

"Q. Tell what happened next. A. Well I had been—we had moved some stuff over there that day. Fred Brummett had helped us with it. He had threatened Fred and told me if I didn't leave Gene and go live with him that he would kill him.

"Q. Who told you that? A. Oris Hurd.

"Q. If you wouldn't leave who? A. Gene.

"Q. That Oris Hurd would do what to you? A. Would kill Gene.

"Q. Where was he? A. Standing in the kitchen.

"Q. What else did he say to you in there? A. Well, I don't know he was just talking. I asked him

who told him we moved over there and he said, 'Luke Hill.'

"Q. When he told you if you didn't live with him he would kill Gene Bowlin what did you say? A. I told him I wouldn't leave him."

Joe McClellan testified that when he arrived at the Bowlin home appellant approached him and said he intended to build a two-room house on the river bank and "I God, if Gene Bowlin stays here, I mean to stay." After testifying that he went in the kitchen and took one drink with appellant, the witness said:

"* * * I went on out and left them in there, and after while I starts through the kitchen before I went to the river, and just as I was getting in the kitchen, there was nobody in there but Oris and Della and Oris says, 'Well, if you don't, I'll kill the damn son-of-a-bitch.' I moseyed on out and very quick Della went in the other room and Oris follows me out and we get on the left hand side of the house and Curtis Littrell comes around the house and meets me there and Oris said, 'Are you going to let me put up a house down here?' I said, 'No.' 'Well,' he said, 'I aim to stay if Gene stays.' I said, 'I aim for Gene to stay.' He said, 'I God I don't aim for him to stay.' "

McClellan and his grandson left the house and went to the river bank followed by the other men. A discussion took place between the six men, the appellant insisting on crossing in the boat with Bowlin. Littrell, Burton and Denney got in one boat and started across the river. Appellant, Bridgeman and the deceased walked down the river bank about 50 yards, got in the other boat and started across. About midstream someone began rocking the boat and appellant began taking off his clothes. As to what occurred at this point Joe McClellan testified as follows:

"A. I hollered and said, 'Boys, bring Gene back over here. They ain't no use to take him over there.' Bridgeman and Hurd raised up and looked at me and turned the skiff loose and pulled out in the current of the river and went on down floating, and went away on down and begin to rock it again.

"Q. Could you tell at that time when the skiff

began to rock what Gene Bowlin was doing? A. It rocked a little and stopped, then Gene Bowlin still had on his undershirt. He had pulled all of his clothes off but his undershirt and was standing in the boat with one hand hold of his collar, and his left hand was hold of his undershirt, bending over this way. The skiff begin to rock and he went out on his right shoulder.

"Q. At that point was Gene Bowlin rocking the skiff? A. I don't see how he could have been.

"Q. Could he have been if you saw his hands? A. He could have with his feet.

"Q. After he went out of the boat, what then did Hurd and Bridgeman do with the boat? A. Just floated on by him.

"Q. Did they make any effort to get him in the boat? A. No, and when the end Oris was sitting in was getting too far away, he stuck the paddle in the water and Bridgeman did the same. They stayed close with him. When the skiff turned, he was so close to the skiff part of the time you couldn't see Bowlin.

"Q. At that time was Bowin swimming? A. Yes, high and nice. He swam down from where they got in the skiff to where he got drowned, 350 to 400 yards and was getting into the eddy water part of the river, getting pretty near in that eddy water and Oris put his paddle in under the skiff and gave it two jerks.

"Q. Oris Hurd? A. Yes, I was looking at him, and I stumbled over a briar, and when I stumbled, he was raising his paddle up above the skiff.

"Q. When you stumbled, where was Hurd's paddle in his hand at that time? A. He had the paddle in his hand, coming up this way going on over his right shoulder, and when he shoved the boat, they pulled it right up close to Bowlin, and I stumbled and I heard a noise, and when I looked again, he was raising the paddle up about that far from Bowlin, coming up this way. * * *

"Q. Did he swim any more after you heard that noise? A. That is where he quit.

"Q. Until that happened tell the jury if he was swimming good. A. Yes, until that happened. After

that happened after he come up he was by the skiff, and Oris had the paddle and he made two grabs at it, and Oris moved the paddle out of his reach to keep him from getting it.

"Q. Pulled it back from him? A. Yes.

"Q. What happened then? A. Just floated on until he went down and stayed down."

Appellant and Bridgeman then rode to the south shore of the river and ran up the bank. Walter Denney and Otha Lee Burton, who crossed in the first boat and reached the south bank before Bowlin jumped or fell into the river, were introduced by appellant. They saw Bowlin swimming, but went up the bank before he sank. Appellant testified that Bowlin was never nearer than 10 feet to the boat after he left it and was 50 yards below it when he sank. According to all of the proof Bowlin was a good swimmer. The Commonwealth established motive, proved threats by appellant made just before Bowlin's death, and produced evidence by an eyewitness pointing unerringly to appellant's guilt. There is no merit in the contention that the evidence was insufficient to take the case to the jury and to sustain its verdict.

In his motion for a new trial appellant assigned as ground one "Errors in Admitting Incompetent Evidence Offered by the Commonwealth." In his brief he says the Bill of Evidence discloses that there were many objections to evidence offered by the Commonwealth, and, while most of the objections to the testimony were sustained, the court failed to admonish the jury not to consider the same. He fails to point out specifically a single alleged error in this respect, but invites the Court to examine the record and discover them. Ordinarily, we decline such invitations, but, on account of the nature of the punishment inflicted, we have read the record carefully to ascertain whether or not prejudicial error was committed. We find four instances in which objections were interposed by the defendant during the introduction of the Commonwealth's evidence. Mrs. Bowlin was asked where the men went after they left her home and she answered, "I reckon they went to the river." An objection by the defendant was sustained. It seems to be his argument that failure of the court to

admonish the jury not to consider the answer constituted error. All of the witnesses on both sides, including appellant, testified that the eight men went to the river when they left the Bowlin home. No possible prejudice to appellant's rights could have resulted, even if the answer had been admitted over his objections. Mrs. Bowlin was also asked if anyone returned for appellant's shotgun which was left at the house, and she answered, "Somebody came and got the gun. Oris went back I think after it. I wasn't there." An objection to the answer was sustained, but no admonition to disregard it was given. Joe McClellan testified that appellant returned late in the day for the gun and the witness refused to permit him to go into the house. Appellant made no denial. Joe McClellan during the direct examination was asked a question calling for an opinion by the witness, but an objection to the question was sustained and it went unanswered. On re-cross examination of the same witness by the defendant's attorney the witness undertook to express an opinion in answer to a question and an objection was interposed as the witness started his answer. The objection was sustained and the court said: "The jury will not consider any opinion or what the witness thinks about it. He can only testify as to facts." Thus it will be seen that no prejudicial error was committed by the admission of incompetent evidence. Furthermore, appellant accepted the court's ruling in each instance and failed to take an exception.

One of the grounds relied upon for a new trial was newly discovered evidence. The newly discovered witnesses were R. R. Lee, the undertaker who prepared the body of Gene Bowlin for burial, and Curtis Littrell, who was in the boat with Burton and Denney when Bowlin lost his life. The defendant filed his own affidavit and the affidavit of R. R. Lee. The Commonwealth's attorney and the county attorney filed counter affidavits. Lee was subpoenaed as a witness for both the Commonwealth and the defendant and Littrell was subpoenaed as a witness for the Commonwealth. Both were present when the case was called or during its progress. Lee had to conduct a funeral out in the county during the afternoon and the Commonwealth's attorney informed him that if the Commonwealth needed

him he would be called prior to twelve o'clock. Littrell left Monticello, the county seat, during the trial without permission of the Commonwealth, but the defendant was permitted to read his testimony given at the examining trial where he had been subjected to a long cross examination by the defendant's attorney. R. R. Lee's place of business was in Monticello, and appellant knew he had prepared Bowlin's body for burial and it was incumbent upon him to ascertain what Lee knew about the case. He had ample time, since the indictment was returned June 17, 1947, and the case was called for trial November 25, 1947. No complaint because of Lee's absence was made at the trial, and it is apparent that his presence could easily have been obtained if it had been requested. We find no merit in this ground.

The instructions are criticized in a general way, but they presented the only issue involved in an intelligible manner. The jury could not have been misled. Appellant argues that he was entitled to an instruction on his theory that the deceased voluntarily jumped into the river and was drowned accidentally. Instruction No. 4 answers the argument. The instruction reads:

"If the jury shall believe from the evidence that the killing of the deceased, Gene Bowlin, was not murder or voluntary manslaughter as defined in Instructions Nos. 1 and 2 above, but was unintentional and accidental, then they should find the defendant not Guilty."

We find no prejudicial error and the judgment is affirmed.